IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
December 8, 2020 Session

**PAMELA MOSES v. TERRY ROLAND ET AL.**

**Appeal from the Circuit Court for Shelby County**
**No. CT-005257-17  William B. Acree, Senior Judge**

_____

**No. W2019-00902-COA-R3-CV**
_____

A former county commissioner appeals the trial court's decision finding him liable for defamatory statements made about a private individual during a county legislative meeting. Following a thorough review of the record, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reverse and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which ARNOLD B. GOLDIN, and KENNY ARMSTRONG, JJ., joined.

John Marshall Jones, Memphis, Tennessee, for the appellant, Terry Roland.

Pamela Moses, Memphis, Tennessee, Pro se.

**OPINION**

### I.  FACTUAL AND PROCEDURAL HISTORY

This case involves a claim of slander. On June 21, 2017, the Law Enforcement Corrections and Courts Committee ("the Law Enforcement Committee") of the Shelby County Board of Commissioners held a regularly scheduled meeting. The agenda for the meeting was "a Resolution approving a contract with Clarion Security for security guard services at specified locations throughout Shelby County Government." Among those present for this meeting were Defendant/Appellant Terry Roland, an elected member of the Shelby County Board of Commissioners,[1] and Plaintiff/Appellee Pamela Moses, an unelected community member and organizer. During the discussion of the security

_____

[1] Mr. Roland no longer serves on the Shelby County Board of Commissioners, as he was term-limited.

contract, the question of whether the county judges supported the new contract was raised. The Law Enforcement Committee Chairperson Billingsley responded that a meeting was scheduled for all of the Shelby County judges on June 23, 2017, so as to get the judges' input as to the security contract and their security concerns. Specifically, Chairperson Billingsley stated that

> [Q]uite frankly, I think their biggest concerns are — and it is really hard to do because you are going to have some people coming and going in these positions, but their concerns are that — but you are probably more familiar with this than me, but there are certain people that have been identified as threats to the Court; that you need someone to put an eyeball on and so the judges want to be sure that [the representative of Clarion Security] and her companies know who those individuals are. I do not understand the process in the Courthouse. I guess I will learn on Friday how we do that. You know, the City of Memphis — I am just bringing this up — but the City of Memphis got in a lot of trouble for identifying people that they didn't want in City Hall. So, I will be asking for a lot of clarification — and I will also ask, if it is appropriate, if the Sheriff's Department would please join me on Friday when we meet with these judges to be sure that we are dotting our i's and crossing our t's.

Thereafter, Mr. Roland made the following comment:

> There is a list that we have got here in Shelby County — it is based upon facts and the ones that aren't allowed — some of them may be here in this audience right now that have to be — in other words, what they did was considered criminal towards the judges. So, there is a difference between a hit list and when you assault or threaten a judge. I mean, that even carries a little stiffer consequences when you threaten a judge.

The meeting continued with additional discussion of the security contract. At the conclusion of the meeting, Mr. Roland was permitted the opportunity to make a final remark on his decision to abstain from voting on the security contract. As the conclusion of his remarks on the propriety of switching security companies without cause, Mr. Roland made the following statement: "And I want to make sure — and this lady right here is the one that Homeland Security had better be watching. Okay, Ms. Moses, over here, because she is not supposed to be in here without a — somebody escorting her."

A meeting of the full Shelby County Board of Commissioners next occurred on June 26, 2017. Ms. Moses was initially given two minutes to speak at this meeting, in which she objected to the contract with Clarion Security. Additionally, Ms. Moses attempted to read a letter objecting to the statements made by Mr. Roland at the prior Law Enforcement

- 2 -

Committee meeting.[2] Because Ms. Moses' time expired, another individual used her time to read Ms. Moses' letter in full:

> I am writing to you in regards of the comments you made about Pamela Moses last week. Commissioner Roland, you referred to her as a terrorist and said that Homeland Security should be watching Ms. Moses. I find these comments to be disrespectful. I feel it was done because of the gender and her race. The said comments were made in the presence of 80 or more people at the hearing with the intention of portraying me as a dangerous person (meaning her). This is not the first time that you have made disrespectful references. Your behavior is uncouth and inappropriate for you to be an elected official. Several media outlets and distinguished members of law enforcement heard these comments. I have consulted with legal counsel and I am prepared to take legal actions against you in your personal and official capacity and I am requesting a sincere apology to Ms. Moses.[3]

Mr. Roland responded as follows:

> What she said is absolutely true. I did say that about Ms. Moses and I stand by it. Ms. Moses has been in the — as a matter of fact, she has threatened judges . . . . She has threatened everybody . . . . She has threatened everybody, but I can tell you, this dog ain't gonna run, okay? And I stand by everything I said the other day and other than that, I have nothing else to say to her.

In December 2017, Ms. Moses filed a complaint for damages against Mr. Roland in the Circuit Court of Tennessee for the Thirtieth Judicial District at Memphis ("the trial court"), alleging defamation and negligent infliction of emotional distress ("NIED"). Ms. Moses subsequently filed various amended complaints, adding Shelby County and then-mayor of Shelby County Mark Luttrell as defendants, and also alleging intentional infliction of emotional distress ("IIED"). On August 9, 2018, the trial court granted in part and denied in part Appellant's motion for summary judgment or, alternatively, to strike Ms. Moses' notice of filing and her second amended complaint. In ruling on Appellant's motion, the trial court found that there was a genuine issue of material fact as to whether Appellant's statements were willful, wanton, or grossly negligent, such that he would not be immune under Tennessee Code Annotated section 29-20-201(b)(2). Furthermore, the court found that there was an issue of fact as to whether Mr. Roland had republished one of his statements such that the statute of limitations would not have run on Ms. Moses' claims, and as to whether said statement was relevant to some of Ms. Moses' other claims. Therefore, the court determined that summary judgment was not proper on Appellant's

---

[2] It is unclear who wrote the letter.

[3] The letter also claimed disrespectful conduct by Chairperson Billingsley, which comments are not at issue in this appeal.

claims that he was immune from suit and that Ms. Moses' claims were time barred. However, the trial court granted summary judgment in Appellant's favor on the NIED and IIED claims, finding that the gravamen of Ms. Moses' claims was slander. The trial court also granted Appellant's motion to strike Ms. Moses' jury demand in her second amended complaint.

The trial court held a bench trial on April 1, 2019. At the beginning of trial, the trial court orally dismissed the claims against Shelby County and Mayor Luttrell. At trial, Mr. Roland claimed that he was provided an official report from Sheriff's Deputies representing Homeland Security that stated that Ms. Moses was known to have "outbursts" in meetings and that she

> had an order of protection against her and that she stalked judges and that she had trouble at the Juvenile Court and that she had had trouble at Federal Court. And that she was on Homeland Security, on their list to watch. When she enters a County building she has to be escorted.

Mr. Roland stated that this information was given to him both in 2012 or 2013 after he was newly elected, and merely "a year before" the June 2017 meetings. Mr. Roland, however, did not produce a copy of the alleged report, as he testified that he no longer serves as a county commissioner and no longer had access to the document. Mr. Roland also claimed that he was never provided with a copy of the report to retain for his own records.

Mr. Roland further testified that his comment that Ms. Moses "threatened everybody" was in reference to Juvenile Judge Dan Michael and General Sessions Judge Phyllis Gardner. According to Mr. Roland, the Sheriff's Deputies supplied him with the information concerning the alleged threat against Judge Michael. Mr. Roland also testified that he has personally heard Ms. Moses threaten to "get" Judge Gardner when Ms. Moses was protesting outside a county building. Mr. Roland admitted, however, that he had never seen an order of any kind that prevented Ms. Moses from entering all county buildings unescorted.

The record contains a final order of protection entered in the Shelby County General Sessions Court on or about February 17, 2015. Therein, the general sessions court found that Ms. Moses has engaged in a campaign of harassment against Judge Gardner. As such, the general sessions court prohibited Ms. Moses from having any contact with Judge Gardner, from coming about Judge Gardner's workplace "unless [Ms. Moses] ha[s] legitimate business in the courthouse."[4] If Ms. Moses did have such business, she was to notify courthouse security personnel of her presence and the existence of the order of protection immediately upon entrance to the building. It appears that Ms. Moses appealed

---

[4] The trial court explained that "this does not include contrived business just to come to the courthouse under the guise of legitimate business. The Court knows the difference[.]"

this order of protection to circuit court; Judge Gardner eventually voluntarily dismissed the case on or about October 15, 2015. The testimony regarding Mr. Roland's knowledge of the order of protection is somewhat confusing and contradictory:

> Q. Do you know that Judge Phyllis Gardner took out an order of protection that was signed by prosecutor Michael Cross against me?
> A. No, ma'am.
> Q. You didn't know that?
> A. *I knew that there was an order of protection taken out on you*, but I didn't know who did it.
> Q. So you did not know that prosecutor Michael Cross signed that document in 2014?
> A. No.
> [additional discussion concerning the prosecutor and a sustained objection]
> Q. You didn't know that she signed an order of protection against me?
> A. No.

(Emphasis added). Mr. Roland further asserted that it was common knowledge that Ms. Moses had threatened Judge Gardner.

Counsel for Mr. Roland also submitted an order entered by Judge Michael preventing Ms. Moses from entering juvenile court. Ms. Moses had previously objected to the entry of that order, but the trial court ruled that it "would allow the order to be admitted for the purpose of establishing that Judge Michael ordered that she should not go into the Juvenile Courthouse without an escort."[5]

Ms. Moses also admitted that she pleaded guilty to the criminal charge of stalking Judge Gardner. As a condition of her probation, Ms. Moses was ordered to refrain from any contact with Judge Gardner. Ms. Moses testified, however, that she had attempted to withdraw the plea; while that request was apparently denied, Ms. Moses claimed that it was still on appeal.[6]

The trial court entered a written order on May 13, 2019, in favor of Ms. Moses. The trial court found that Mr. Roland's trial testimony was "inconsistent and troubling, and his credibility is suspect." The trial court noted that orders had been entered that prevented Ms.

---

[5] The trial court ordered that this document would be marked as an exhibit, but it is omitted from the appellate record.

[6] We take judicial notice of the fact that while Ms. Moses did seek to withdraw her guilty plea, that request was denied. *See* ***State v. Moses***, No. W2015-01240-CCA-R3-CD, 2016 WL 4706707, at *2 (Tenn. Crim. App. Sept. 6, 2016), *perm. app. denied* (Tenn. Jan. 23, 2017). A post-judgment petition in the nature of a writ of habeas corpus was also denied, and the judgment was affirmed by the Court of Criminal Appeals. *See* ***State v. Moses***, No. W2019-01219-CCA-R3-CD, 2020 WL 4187317, at *1 (Tenn. Crim. App. July 20, 2020), *perm. app. denied* (Dec. 4, 2020). As such, her guilty plea was not withdrawn.

Moses from entering both the general sessions court and the juvenile court without escorts, but that these orders "did not apply to other courts or county buildings." Moreover, the trial court found that Mr. Roland "did not learn" of the order of protection until after his June 2017 comments. The trial court further found that while Mr. Roland's statement that Ms. Moses threatened judges was true and therefore not defamatory, his statements that Ms. Moses was "not supposed to be in here without . . . someone watching her" and that she threatened "everybody" were not true and defamatory. The trial court further found that these statements were published and that Mr. Roland acted with reckless disregard for their truth or falsity. The trial court further found that Mr. Roland was not immune under Tennessee Code Annotated section 29-20-201(b) because his statements "were not necessary to conduct the business of the meetings." Additionally, the trial court stated that "even if the words arose from the business of the meetings, the Court finds that Mr. Roland's conduct amounts to willful, wanton, and gross negligence" under the statute. As to damages, however, the trial court ruled that

> Ms. Moses has testified that she was humiliated and embarrassed. Ms. Moses is a frequent litigant in Shelby County Courthouses. The Court does not offer that as a criticism to Ms. Moses, except to state that her reputation has been somewhat of an issue because of the extensive litigation in which she has been involved.
> The Court finds there is no evidence of actual damages in this case. The Court finds that a nominal award of Five Hundred Dollars ($500.00) is appropriate.

Mr. Roland filed his notice of appeal on May 22, 2019.

While this appeal was pending, the trial court entered a written order on October 25, 2019, *nunc pro tunc* to April 1, 2019, which memorialized its oral ruling dismissing Shelby County and Mayor Luttrell as parties. The trial court later entered an amended order on or about February 4, 2021, to ensure that all orders complied with Rule 58 of the Tennessee Rules of Appellate Procedure.

## II.    ISSUES PRESENTED

Mr. Roland raises the following issues in his brief, which we have reordered and slightly restated:

1. Whether the trial court erred in finding that the immunity provision of Tenn. Code Ann. § 29-20-201(b)(2) does not apply to the allegedly defamatory statements made by Mr. Roland (Roland denies that he defamed Ms. Moses), who was speaking in his capacity as a Commissioner of the Shelby County Board of Commissioners during Commission proceedings, regarding Ms. Moses?

- 6 -

2. Whether the trial court erred in finding that Mr. Roland's statement that Ms. Moses should be watched by Homeland Security was defamatory?
3. Whether the trial court erred in finding that Mr. Roland's statement that Ms. Moses made threats against everybody was defamatory?
4. Whether the trial court erred in holding Mr. Roland liable to Ms. Moses for slander, where the court found "no evidence of actual damages"?

In contrast, Ms. Moses argues that the trial court was correct with regard to its immunity and defamation decisions, but takes issue with the trial court's damages award.[7]

## III. STANDARD OF REVIEW

In an appeal from a bench trial, we review the trial court's findings of fact de novo with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). No presumption of correctness, however, attaches to the trial court's conclusions of law, and our review is de novo. **Blair v. Brownson**, 197 S.W.3d 681, 684 (Tenn. 2006) (citing **Bowden v. Ward**, 27 S.W.3d 913, 916 (Tenn. 2000)).

## IV. DISCUSSION

We begin with the question of immunity under the Tennessee Governmental Tort Liability Act ("GTLA"). Pursuant to Tennessee Code Annotated section 29-20-201(b),

(1) The general assembly finds and declares that the services of governmental entity boards, commissions, authorities and other governing agencies are critical to the efficient conduct and management of the public affairs of the citizens of this state. Complete and absolute immunity is required for the free exercise and discharge of the duties of such boards, commissions, authorities and other governing agencies. Members of boards, commissions, authorities,

---

[7] Ms. Moses has represented herself pro se throughout these proceedings. "While entitled to fair and equal treatment before the courts, a pro se litigant is still required to comply with substantive and procedural law as do parties represented by counsel." **Gilliam v. Gilliam**, No. M2007-02507-COA-R3-CV, 2008 WL 4922512, at *3 (Tenn. Ct. App. Nov. 13, 2008) (citing **Hessmer v. Hessmer**, 138 S.W.3d 901, 903 (Tenn. Ct. App. 2003)). As explained by this Court, "[t]he courts should take into account that many pro se litigants have no legal training and little familiarity with the judicial system. However, the courts must also be mindful of the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary." **Jackson v. Lanphere**, No. M2010-01401-COA-R3-CV, 2011 WL 3566978, at *3 (Tenn. Ct. App. Aug. 12, 2011) (quoting **Hessmer**, 138 S.W.3d at 903 (internal citations omitted)). "[A]lthough this Court gives pro se litigants a certain amount of leeway in their filings, . . . we have ruled that this leeway is generally reserved for those 'untrained in the law.'" **Masserano v. Masserano**, No. W2018-01592-COA-R3-CV, 2019 WL 2207476, at *5, 5 n.11 (Tenn. Ct. App. May 22, 2019) (quoting **Lacy v. Mitchell**, 541 S.W.3d 55, 59 (Tenn. Ct. App. 2016) (citing **Hessmer**, 138 S.W.3d at 903)). We keep these principles in mind in adjudicating this appeal.

- 7 -

and other governing agencies must be permitted to operate without concern for the possibility of litigation arising from the faithful discharge of their duties.

(2) All members of boards, commissions, agencies, authorities, and other governing bodies of any governmental entity, created by public or private act, whether compensated or not, shall be immune from suit arising from the conduct of the affairs of such board, commission, agency, authority, or other governing body. Such immunity from suit shall be removed when such conduct amounts to willful, wanton, or gross negligence.

Thus, section 29-20-201(b) provides that members of governmental commissions are absolutely immune from suit "arising from the conduct of the affairs" of the commission, unless the conduct "amounts to willful, wanton, or gross negligence[.]" "Although the legislative privilege is absolute, and bars a defamation claim when it is held to apply, it is not without limits." *Miller v. Wyatt*, 457 S.W.3d 405, 410 (Tenn. Ct. App. 2014). The privilege "'does not give a member of a subordinate legislative body the right to use his or her position as a forum for private slanders against others.'" *Issa v. Benson*, 420 S.W.3d 23, 27 (Tenn. Ct. App. 2013) (quoting *Cornett v. Fetzer*, 604 S.W.2d 62, 63 (Tenn. Ct. App. 1980)). "Because a reason supporting the legislative privilege is to insure an uninhibited debate concerning matters before a legislative body, it follows that such a privilege is applicable only if the defamatory remarks are made relating to matters within the scope of that body's authority." *Miller*, 457 S.W.3d at 410 (internal quotation marks omitted) (quoting *Issa*, 420 S.W.3d at 27). In analyzing this issue, "our inquiry centers on the nature and scope of the statements at issue vis-a-vis [the relevant board or commission's] legislative functions." *Issa*, 420 S.W.3d at 28. In other words,

> Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it. The privilege of absolute immunity "would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives." Furthermore, it simply is "not consonant with our scheme of government for a court to inquire into the motives of legislators."
>
> * * *
>
> This leaves us with the question whether, stripped of all considerations of intent and motive, petitioners' actions were legislative.

*Miller*, 457 S.W.3d at 410 (internal citations omitted) (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 55, 118 S. Ct. 966, 973, 140 L. Ed. 2d 79 (1998)).

Here, Mr. Roland takes issue with the trial court's finding that he was not immune under the statute because his comments "were not necessary to conduct the business of the

- 8 -

meetings." Instead, Mr. Roland contends that his comments were well within the scope of the Law Enforcement Committee's discussion, as they were specifically referencing security concerns related to judges. As such, he asserts that his "remarks were certainly within the [Shelby County Board of Commissioner's] legitimate legislative sphere[.]" *Issa*, 420 S.W.3d at 27.

As an initial matter, we note that the trial court found only two of Mr. Roland's statements were actionable in this case: (1) that Ms. Moses should be watched by Homeland Security and was to be escorted into county buildings (the "initial comments"); and (2) that Ms. Moses threatened "everybody."[8] We therefore being our analysis with determining whether Mr. Roland has immunity under section 29-20-201(b)(2) related to his initial comments. From our review of the record, we agree that the evidence preponderates against the trial court's finding that these initial comments did not arise from the conduct of the Shelby County Board of Commissioners.

First, the evidence shows that Mr. Roland's initial comments were made during regularly scheduled, open meetings of the Shelby County Board of Commissioners, the first at a meeting of the Law Enforcement Committee, and the second before the full board. In *Miller*, we held that while not dispositive, the fact that a statement was made during a meeting of this kind "weighs in favor of applying legislative privilege[.]" 457 S.W.3d at 411.

Second, Mr. Roland's initial comments about Ms. Moses needing to be watched by Homeland Security and to be escorted into county buildings was made during a committee meeting, the express purpose of which was to consider the security provided for county buildings. In fact, earlier in the meeting, the committee discussed the specific issue of judge security; it was public record at that time that Ms. Moses had pleaded guilty to the crime of stalking Judge Gardner, a Shelby County judge. *See Moses*, 2016 WL 4706707, at *2 (stating that Ms. Moses entered guilty pleas for stalking and other charges on April 29, 2015). Whether Ms. Moses or other individuals posed a security threat, particularly in relation to her contact with county buildings and the employees that inhabit them was, therefore, well "within the legitimate business of the [committee] to discuss[.]" *Id.* at 412. Under these circumstances, we conclude that Mr. Roland met his burden to show that his initial comments at the June 26, 2017 meeting of the Law Enforcement Committee were "within the scope" or "legislative sphere" of the Shelby County Board of Commissioners. *Issa*, 420 S.W.3d at 27.

Because Mr. Roland's initial comments arose from the legitimate business of the

---

[8] Ms. Moses insists that Mr. Roland also called her a terrorist. The transcripts from the two meetings do not reveal that Mr. Roland used that specific word. In any event, the trial court specifically found that only the two above statements were actionable, and Ms. Moses has not designated as an issue that the trial court erred in determining that only those two statements were untrue and defamatory.

Shelby County Board of Commissioners, immunity is only removed if his conduct "amounts to willful, wanton, or gross negligence." Tenn. Code Ann. § 29-20-201(b)(2). "Local governmental officials are not immune from suit for willful or wanton acts or acts amounting to gross negligence." *Moore Const. Co. v. Story Eng'g Co.*, No. 01A01-9606-CV-00267, 1998 WL 382198, at *4 (Tenn. Ct. App. July 10, 1998). The trial court found that even if Mr. Roland's statements "arose from the business of the meetings," Mr. Roland's conduct amounted to willful, wanton, or gross negligence. Mr. Roland contends that the evidence preponderates against this finding, relying heavily on his testimony concerning the alleged Homeland Security report and the trial court's purportedly unsupported finding that Mr. Roland's testimony was inconsistent.

Under the plain language of the statute, immunity will not be removed unless the defendant's conduct amounts to "willful, wanton, or gross negligence." Nothing in the GTLA specifically defines these terms. "Willful negligence involves deliberation and malice." *Schwartz v. Johnson,* 280 S.W. 32, 33–34 (Tenn. 1926); *see also* *Bryan v. Paramount Packaging Corp.*, 677 S.W.2d 453, 454 (Tenn. 1984) (citing *Glass v. Sullivan,* 170 Tenn. 230, 94 S.W.2d 381 (1936)) (stating in the context of the worker's compensation statute that "willful misconduct . . . means something more than mere negligence and carries the idea of deliberation and intentional wrongdoing"). *Black's Law Dictionary* defines the term "willful" as not necessarily requiring malice: "[v]oluntary and intentional but not necessarily malicious." *Black's Law Dictionary* 1737 (9th ed. 2009). Wanton negligence is defined as "[a] heedless and reckless disregard for another's rights, with the consciousness that the act or omission may result in injury to another." *Craig v. Stagner,* 19 S.W.2d. 234, 236 (Tenn. 1929); *see also Black's Law Dictionary* at 1719 (defining "wanton" as "[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences"). "'To prevail on a claim of gross negligence in Tennessee, a plaintiff must demonstrate ordinary negligence and must then prove that the defendant acted 'with utter unconcern for the safety of others, or . . . with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law . . . .'" *Leatherwood v. Wadley*, 121 S.W.3d 682, 694 (Tenn. Ct. App. 2003) (quoting *Menuskin v. Williams,* 145 F.3d 755, 766 (6th Cir. 1998)). "Whether or not a defendant's conduct rises to the level of willful, wanton or gross negligence turns upon the facts of each case." *KMI Grp., Inc. v. Wade Acres, LLC*, No. W2018-00301-COA-R3-CV, 2019 WL 1504034, at *11 (Tenn. Ct. App. Apr. 5, 2019) (citing *Inter-City Trucking Co. v. Daniels*, 178 S.W.2d 756, 758 (Tenn. 1944)). Thus, to remove immunity in this situation, the facts must demonstrate not just simple negligence, but also a reckless disregard for the rights of others.

Comparatively, this standard for the removal of immunity is very similar to the higher of the two standards applicable in private plaintiff defamation cases. According to this Court,

To establish a claim for defamation, 'the plaintiff must establish that: (1) a

party published a statement; (2) with knowledge that the statement is false and defaming to the other; or (3) *with reckless disregard for the truth of the statement* or with negligence in failing to ascertain the truth of the statement.'

***Brown v. Mapco Express, Inc.***, 393 S.W.3d 696, 708 (Tenn. Ct. App. 2012) (emphasis added) (quoting ***Sullivan v. Baptist Mem. Hosp.***, 995 S.W.2d 569, 571 (Tenn. 1999)). [9] Thus, both the GTLA gross negligence standard and the reckless disregard of the truth standards speak in terms of the defendant recklessly disregarding the rights of others. We therefore conclude that in the context of determining whether immunity is removed under section 29-20-201(b)(2) for the tort of defamation, authority concerning the reckless disregard for the truth standard is helpful in determining whether Mr. Roland committed at least gross negligence.

While there is little caselaw explaining what conduct meets the gross negligence standard in the context of GTLA immunity, there is considerable caselaw regarding what conduct constitutes a reckless disregard for the truth. "Determining whether a defendant acted with reckless disregard requires the finder of fact to determine whether the defendant 'in fact entertained serious doubts as to the truth of his [or her] publication.'" ***Tomlinson v. Kelley***, 969 S.W.2d 402, 406 (Tenn. Ct. App. 1997) (quoting ***Trigg v. The Elk Valley Times***, 720 S.W.2d 69, 775 (Tenn. Ct. App. 1986) (quoting ***St. Amant v. Thompson***, 390 U.S. 727, 731, 88 S. Ct. 1323, 1325, 20 L.Ed.2d 262 (1968))). In other words, there must be a "'high degree of awareness of probable falsity.'" ***Taylor v. Nashville Banner Pub. Co.***, 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978) (quoting ***Garrison v. Louisiana***, 379 U.S. 64, 74, 85 S. Ct. 209, 216, 13 L.Ed.2d 125 (1964)). Moreover, "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." ***Trigg***, 720 S.W.2d at 74–75 (quoting ***St. Amant***, 390 U.S. at 731). When applying the reckless disregard standard in the context of criticizing an elected official, we have held that speakers "are not required to have documentary proof" to support their statements. ***Tomlinson***, 969 S.W.2d at 406 (involving the actual malice standard, which must be shown with "convincing clarity" rather than by a preponderance

---

[9] In cases where the plaintiff is a public figure, mere negligence is not sufficient to impose liability. We have explained the difference between the two standards thusly:

> As to a public official or public figure, one can only be held liable if he knows that the statement is false and that it defames another person, or if he acts in reckless disregard of such matters. As to a private person, he may be held liable if he knows that the statement is false and that it defames the person, acts in reckless disregard of these matters, or acts negligently in failing to ascertain them.

***Piper v. Mize***, No. M2002-00626-COA-R3-CV, 2003 WL 21338696, at *9 (Tenn. Ct. App. June 10, 2003). While there is no dispute that Ms. Moses is a private figure, the interjection of immunity in this case alters the typical analysis that would be applicable to her defamation claim.

of the evidence).

Respectfully, the record is devoid of evidence that Mr. Roland "in fact entertained serious doubts" about the truth of his statements. *Id.* At trial, Mr. Roland insisted that his statement concerning Homeland Security was based on meetings that occurred between himself and Sheriff's Deputies working with Homeland Security. The trial court, however, took issue with this evidence, citing perceived inconsistencies in the timeline provided by Mr. Roland and his failure to produce the Homeland Security Report at issue. We are likewise troubled by Mr. Roland's heavy reliance on a document that he failed to produce at trial. Moreover, his justification for his failure to produce this document–-that he no longer served as county commissioner–-is unpersuasive, given that he was represented at trial by an attorney employed in-house by the county.

Even if we conclude that this report did not exist, as the trial court's findings seem to suggest, however, its nonexistence does not demonstrate that Mr. Roland actually entertained serious doubts about the truth of his statement that Homeland Security needed to watch Ms. Moses and that she was required to be escorted into county buildings. *Cf.* ***Tomlinson***, 969 S.W.2d at 406 (holding that a lack of documentary proof is not sufficient to show a reckless disregard for the truth under the convincing clarity standard). Simply put, no evidence was presented that Mr. Roland had any misgivings about its truth, or to show the necessary high degree of awareness that it was likely false. The trial court's own findings on this issue bear this out: the trial court did not find that Mr. Roland had doubts as to the truth of his statement, but simply that he "made those statements without knowing whether they were true or not." But Mr. Roland's failure to verify the truth of his statement before making it is not evidence of a reckless disregard. Rather, we have previously held that "'mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth.'" ***Holder v. Serodino***, No. M2014-00533-COA-R3-CV, 2015 WL 5458377, at *13 (Tenn. Ct. App. Sept. 16, 2015) (quoting ***McCluen v. Roane Cnty. Times, Inc.***, 936 S.W.2d 936, 941 (Tenn. Ct. App. 1996)). And making a statement that is not known to be true or false is simply not sufficient to show that Mr. Roland had a "high degree of awareness of probable falsity" as required to show a reckless disregard of the truth. ***Taylor***, 573 S.W.2d at 482.

Moreover, even in the absence of the purported Homeland Security Report, there is some factual basis for Mr. Roland's concern about Ms. Moses and his statement that she was to be escorted into county buildings. It is undisputed that Ms. Moses was convicted of stalking one Shelby County Judge. *See* ***Moses***, 2016 WL 4706707, at *2. The trial court therefore found that Ms. Moses had in fact threatened a judge. Related to the stalking, for a time, Ms. Moses was prevented by an order of protection from entering the Shelby County General Sessions Court without informing security. Although the trial court found that Mr. Roland did not have specific knowledge that Judge Gardner had been granted an order of protection prior to June 2017, Mr. Roland testified that Ms. Moses' issues with Judge Gardner were generally known in the community at that time and he further testified

that he was aware that an order of protection had been taken out against Ms. Moses.[10] Additionally, the trial court specifically found that Judge Michael had entered an order "that barred Ms. Moses from coming into the juvenile courthouse without a police escort[.]"[11] As such, despite his inability to produce the alleged report at issue, the proof does not show that Mr. Roland's understanding of Ms. Moses' past negative interactions with the judiciary, which he claimed came from the disputed report, was not without some grain of truth. Thus, while Mr. Roland may not have shown that it was Homeland Security that placed restrictions on Ms. Moses or that the restrictions involved all county buildings, Mr. Roland's statements were not so lacking in truth that we can infer that he had serious doubts about their veracity when he made them. *Cf.* **United States v. Lanza-Vazquez**, 799 F.3d 134, 141 (1st Cir. 2015) (quoting **United States v. Ranney**, 298 F.3d 74, 78 (1st Cir. 2002)) (holding, in the context of a Fourth Amendment violation claim, that "recklessness can be inferred 'from circumstances evincing obvious reasons to doubt the veracity of the allegations'"). Under these circumstances, while Mr. Roland may have acted negligently in failing to ascertain the truth of his statement, the proof does not show that he acted with reckless disregard of the truth.

In the absence of reckless disregard of the truth, we cannot agree that the evidence is sufficient to remove immunity in this case. While we concede that section 29-20-201(b)(2) does not explicitly require a reckless disregard for the truth, gross negligence, as the minimum level of culpability required to remove immunity, has little distinction from a reckless disregard for the truth in the context of a defamation claim. Indeed, in order to prove gross negligence, the plaintiff must show, at a minimum, a reckless disregard for the rights of others. **Leatherwood**, 121 S.W.3d at 694 (requiring both ordinary negligence and a reckless disregard for the rights of others). The difference between the two standards is therefore nothing more than semantic in this specific context. Thus, while a private individual need only show simple negligence in order to recover for defamation, *see* **Mapco Express**, 393 S.W.3d at 708, we hold that something far closer to a reckless disregard for the truth is required to remove immunity for statements that arise from legislative proceedings under section 29-20-201(b)(2).

The evidence presented simply does not meet this level of culpability. To be sure, there is no evidence to suggest that Mr. Roland entertained any actual, much less serious, doubts, concerning the truth of his statement. While Ms. Moses argues that Mr. Roland's actions met the necessary willful, wanton, or grossly negligent standard, she points to no specific evidence that establishes this high level of culpability. Ms. Moses' brief on this point essentially argues that Mr. Roland failed to provide a sufficient factual basis for the

---

[10] Moreover, both the conviction and the order of protection appear to be public records. *See* Tenn. Code Ann. § 10-7-403 (defining the "[p]ublic records" of the county as "[t]he pleadings, documents, and other papers filed with the clerks of all courts, including the courts of record, general sessions courts, and former courts of justices of the peace, and the minute books and other records of these courts").

[11] The trial court did not specifically find that Mr. Roland had no knowledge of the juvenile court order at the time of his June 2017 comments.

- 13 -

truth of his allegations. Although his statements about Homeland Security and the requirements that Ms. Moses be escorted into all county buildings may have been untrue, the evidence shows that Ms. Moses was for a time under restrictions regarding her entrance into at least two county buildings, the general sessions court and the juvenile court. While the trial court expressed understandable doubts as to when and how Mr. Roland learned the allegations that he made against Ms. Moses, the standard applicable in this case does not require that his comments be strictly true, but only that he did not recklessly disregard the truth or the rights of Ms. Moses. Simply put, there is no proof that he acted "with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law[.]" *Id.* We therefore must conclude that Mr. Roland's statement that Homeland Security should watch Ms. Moses and that she should be escorted into the building are "cloaked with immunity" under section 29-20-201(b)(2). *Miller*, 457 S.W.3d at 412.

We next turn to consider whether immunity protects Mr. Roland's second statement that Ms. Moses had threatened "everybody." Certainly, Mr. Roland did not claim at trial that he had a reasonable basis to believe that Ms. Moses had in fact threatened "everybody." Mr. Roland argues on appeal, however, that the trial court's decision on this matter should be reversed on a separate basis––that the statement was not defamatory as a matter of law.

In Tennessee, "[t]he issue of whether a communication is capable of defamatory meaning is a question of law for the court to decide in the first instance; it is then for the [factfinder] to decide whether the communication was in fact so understood by those who received it." *Mapco Express*, 393 S.W.3d at 708–09 (citations omitted). "In making this determination, a court must look to the words themselves and is not bound by the plaintiff's interpretation of them." *Davis v. Covenant Presbyterian Church of Nashville*, No. M2014-02400-COA-R9-CV, 2015 WL 5766685, at *4 (Tenn. Ct. App. Sept. 30, 2015) (quotation marks and alterations omitted) (quoting *Stones River Motors, Inc. v. Mid-S. Pub. Co.*, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983), *abrogated on other grounds as recognized by Zius v. Shelton*, No. E1999-01157-COA-R3-CV, 2000 WL 739466, at *3 (Tenn. Ct. App. June 6, 2000)).

In support of this argument, Mr. Roland cites a number of federal authorities, which generally hold that a statement is not capable of a defamatory meaning if it was "pure opinion, hyperbole, or rhetorical exaggeration[.]" *Jolliff v. NLRB*, 513 F.3d 600, 610 (6th Cir. 2008); *see also Ogle v. Hocker*, 279 F. App'x 391, 397 (6th Cir. 2008) ("[S]tatements of pure opinion, hyperbole, or rhetorical exaggeration will receive First Amendment protection, but statements deemed capable of carrying a defamatory meaning will not."). According to Mr. Roland, in determining whether a statement is capable of being defamatory in this context we should look to "the degree to which the statements are verifiable, whether the statement is objectively capable of proof or disproof[.]" *Patton Wallcoverings, Inc. v. Kseri*, No. 15-10407, 2015 WL 3915916, at *5 (E.D. Mich. June 25, 2015) (citing *Jolliff*, 513 F. 3d at 611–12). Thus, when a statement is "rhetorical

- 14 -

hyperbole" rather than verifiable or disprovable fact, the statement is not capable of a defamatory meaning.

Under this framework, Mr. Roland contends that his statement that Ms. Moses was threatening everybody is not capable of a defamatory meaning because it is rhetorical hyperbole that cannot be objectively proven or disproven. We agree. Tennessee law provides that "[m]ere hyperbole or exaggerated statements intended to make a point are not actionable defamatory statements." *Farmer v. Hersh*, No. W2006-01937-COA-R3-CV, 2007 WL 2264435, at *5 (Tenn. Ct. App. Aug. 9, 2007) (citing *McCluen*, 936 S.W.2d at 941–42). In *Farmer*, the plaintiff and the defendants were embroiled in a dispute over a local baseball team. The plaintiff eventually sued the defendant for his statements that the plaintiff attempted to "steal" the team from the defendant. We held, however, that this statement was not actionable, as it constituted "an obvious exaggeration intended to emphasize that [the plaintiff] wanted to purchase the team for far less than what [the defendant] considered to be fair market value." *Id.* at *6. We therefore held that the statement was not defamatory as a matter of law. *Id.*

Here, the evidence shows that Ms. Moses pleaded guilty to stalking one judge, Judge Gardner, and an order of protection was entered preventing her from coming about this judge for a period of time. The order of protection specifically states that Ms. Moses engaged in behavior that "terrorized and frightened" Judge Gardner. As a result, the trial court specifically found that it was true that Ms. Moses had threatened one judge. Mr. Roland testified that he was told by security personnel that Ms. Moses also threatened Judge Michael, but again, the trial court found that Mr. Roland lacked credibility. It does appear, however, that Ms. Moses was at some point under an order requiring escort in juvenile court. The record is unclear what circumstances led to the entry of that order. Under these circumstances, Mr. Roland's statement that Ms. Moses had threatened "everybody" was nothing more than an "obvious exaggeration" meant to emphasize Ms. Moses' threatening behavior. *Id.* Instead, it was rhetorical hyperbole intended to make a point. As such, we hold that this statement was not defamatory as a matter of law. Whether Mr. Roland was granted immunity under section 29-20-201(b)(2) is therefore irrelevant with regard to this particular statement. Having determined that the two statements at issue provide no basis for a finding of liability in this case, we reverse the decision of the trial court finding Mr. Roland liable for defamation. All other issues are pretermitted.

## V.    CONCLUSION

The judgment of the Shelby County Circuit Court is reversed, and this cause is remanded for all further proceedings as are necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellee Pamela Moses, for which execution may issue if necessary.

<div align="right">
s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE
</div>